IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAN KOPACZ and JAN KOPACZ, Administrator of the Estate of Cathy Kopacz, | ) ) ) | C.A. No. 04-911 GMS |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| DELAWARE RIVER AND BAY AUTHORITY and CRAIG SWETT | ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) | |
| JAN KOPACZ | ) ) | |
| Plaintiff, | ) ) | C.A. No. 04-1281 GMS |
| v. | ) ) ) | |
| DELAWARE RIVER AND BAY AUTHORITY | ) ) ) | |
| Defendant. | ) ) | |

### Plaintiff's Brief in Opposition to
### DRBA's Motion for Judgment N.O.V.
### or for a New Trial

**SEITZ, VAN OGTROP & GREEN, P.A.**

/s/ James S. Green
**JAMES . GREEN, ESQ. (DE0481)**
**jgreen@svglaw.com**
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600
            Attorneys for Plaintiffs

OF COUNSEL:
E. Alfred Smith, Esquire
E. Alfred Smith & Associates
1333 Race Street, Second Floor
Philadelphia, PA 19107

Date: March 16, 2006

# Table of Contents

**Page**

I. Background    1

II. Argument    2

    A. The jury's verdict on reasonableness is only relevant    2
to the punitive damages issue and is supported by ample evidence.

    B. There is ample evidence to support the award of compensatory damages.    5

    1. Evidence of Blue Cross/Blue Shield coverage is irrelevant to    5
DRBA's duty to pay medical expenses and DRBA's contention is
contrary to settled law.

    2. Plaintiff's claim concerning the harm to his credit rating was    7
made before suit was started and DRBA never pursued this during
discovery, so its contention that "plaintiff never revealed these
damages" is false.

    3. Kopacz alleged and proved legally compensable injuries as a    12
result of DRBA's failure to pay.

    C. DRBA is not entitled to a new trial.    16

      1. Evidence of the FAA physical was properly admitted.    16

      2. Evidence of plaintiff's efforts to have DRBA pay the    18
maintenance and cure without the need for suit was properly
admitted.

      3. Evidence of liability insurance was not deliberately injected by    19
plaintiff, and there is no evidence that it prejudicially affected the
jury's verdict.

      4. Evidence of the harm to plaintiff's credit rating was properly    19
admitted.

      5. The evidence of bias on the part of Willey was properly    20
introduced, and the Court prejudiced plaintiff by instructing the
jury to disregard it.

      6. Plaintiff cannot address the issue of the voir dire questioning of    21
the jury because DRBA is not specific.

i

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| 7. | Failure to instruct the jury as requested by DRBA concerning cure was not error. | 21 |
| 8. | Plaintiff was not allowed to argue that DRBA invaded his privacy, so there was no error. | 22 |
| 9. | No other rulings adversely affected DRBA. | 22 |
| III. | Conclusion | 23 |

**Table of Authorities**

| **Case** | **Page(s)** |
|---|---|
| *Aguilar v. Standard Oil Co.*, <br> 318 U.S. 724 (1943) | 6 |
| *Bavarro v. Grand Victoria Casino*, <br> 2001 WL 289782 (N.D. Ill. 2001) | 14 |
| *Cortes v. Baltimore Insular Line, Inc.*, <br> 287 U.S. 367 (1932) | 14 |
| *Deisler v. McCormack Aggregates Co.*, <br> 54 F.3d 1074 (3rd Cir. 1995) | 14, 15, 19 |
| *Kiernan v. Van Schaik*, <br> 347 F.2d 775 (3rd Cir. 1965) | 21 |
| *Neville v. American Barge Line Co.*, <br> 276 F.2d 117 (3rd Cir. 1960) | 15 |
| *Shaw v. Ohio River Co.*, <br> 526 F.2d 193 (3rd Cir. 1975) | 21 |
| *Smith v. Delaware Bay Launch Service, Inc.*, <br> 842 F.Supp. 770 (D. Del. 1994) | 14 |
| *Vaughan v. Atkinson*, <br> 369 U.S. 527 (1962) | 6, 14 |
| *Vella v. Ford Motor Co.*, <br> 421 U.S. 1 (1975) | 22 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAN KOPACZ and JAN KOPACZ, Administrator of the Estate of Cathy Kopacz, | ) ) ) ) | C.A. No. 04-911 GMS |
| Plaintiff, | ) ) | |
| vi. | ) ) | |
| DELAWARE RIVER AND BAY AUTHORITY and CRAIG SWETT | ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| JAN KOPACZ | ) ) | |
| Plaintiff, | ) ) | C.A. No. 04-1281 GMS |
| v. | ) ) | |
| DELAWARE RIVER AND BAY AUTHORITY | ) ) ) | |
| Defendant. | ) ) | |

**Plaintiff's Brief in Opposition to
DRBA's Motion for Judgment N.O.V. or a New Trial**

## I. Background

Plaintiff's counsel made a good faith effort with DRBA and its claims adjuster to have

DRBA pay plaintiff the maintenance and cure to which he was legally entitled prior to the

institution of suit but failed.  Plaintiff therefore filed the customary non-jury suit for maintenance

and cure and damages associated with its non-payment.  These suits are very easy to try and

require very little proof from plaintiff.  They are filed by themselves to seek a quick resolution

while the counsel fees incurred are very small.  DRBA, however, undertook a massive credibility

defense which prevented a prompt resolution, and DRBA made it eminently clear at every step

that no resolution would ever be possible.  DRBA's stonewalling, which continued for more than

3 ½ years and through a trial, was not only intransigent, it was inane and manifested an utter

insensitivity not only to plaintiff but also to the Court's time and resources.

Plaintiff thereupon started a Jones Act/unseaworthiness suit against DRBA coupled with

a general maritime claim against Craig Swett, the driver of the SUV which struck plaintiff.  The

maintenance suit was transferred from New Jersey and consolidated, with a single jury to hear

both cases.  This is also routine.  DRBA told a Magistrate in Delaware during a telephone

conference that no settlement would ever be possible, and it continued its refusal to pay plaintiff

his maintenance and cure.

A five day trial resulted in a jury verdict which found that plaintiff had not been struck

and injured by the Swett vehicle but that DRBA was liable for maintenance and cure and its

refusal to pay was unreasonable and without reasonable justification.  Following the verdict

DRBA paid the accumulated maintenance, cure and sick and annual leave, but it did not pay the

compensatory damage award of $47,500.  Instead, it filed the Motions now before the Court.

## II. Argument

### A.  The jury's verdict on reasonableness is only relevant to the punitive damages issue and is supported by ample evidence.

Plaintiff sought to have the jury answer this interrogatory to make a record for an appeal

on the punitive damages issue, which the Court had dismissed on Motion by DRBA.*  If the

Third Circuit reverses this Court's ruling on punitive damages, a retrial will be limited to the

amount of punitive damages since there is no need to retry everything else.

Nevertheless, there is ample evidence to support the jury's finding that DRBA's refusal to pay was unreasonable and without reasonable justification.

It is untrue to say that the basis for DRBA's refusal to pay was that the accident did not occur.  That was only one of the excuses it has offered.  DRBA never asked Bonnie Miller at trial why the maintenance and cure were not paid.  The only evidence the jury heard on this point was her opinion that plaintiff had gotten the "crap" beaten out of him the night before and came to work and tried to blame it on being hit by the Swett vehicle.  This view, mean-spirited, petty, spiteful and grounded in ignorance, was relevant since Miller admitted she was part of the decision-making process.  DRBA's counsel did nothing to lessen the impact of this testimony or otherwise attempt to clarify the record.

DRBA's defense in the Pre-Trial Order and at trial was that plaintiff had been reprimanded for ill treatment of passengers and was trying to use the injury to hide another such incident.  However, there was virtually no such evidence, and Ms. Miller did not offer that as an excuse.  A performance rating as of June 2002 hinted at one such incident, but Capt. Pulli characterized this remark as "overly critical."   Mrs. Romano's complaint was never brought to plaintiff's attention, and she admitted that Capt. Pulli's letter (Ex. DRBA-20) said that no other crew member knew anything about it.

* The finding on reasonableness does not affect plaintiff's entitlement to counsel fees because DRBA's intransigence is undisputed.  Counsel made several efforts to have DRBA pay the maintenance and cure without the need for a lawsuit, but the maintenance and cure were not paid until they were received by counsel on February 27, 2006.

The only other incident allegedly occurred on the morning of the accident, but plaintiff testified this was never brought to his attention.  Pilot Oat admitted that he didn't make a written report until December 2002, and he couldn't remember who the corroborating witness was.  He

was surprised to learn, upon looking at his report, that it was Mike Willey.

Plaintiff left the ferry and was taken by ambulance to Beebe Memorial Hospital, where he was considered disabled for 3 days. Ms. Miller testified that DRBA knew of that determination and did not challenge it. She admitted that DRBA accepted, without challenge, all of the disability evaluations of the treating doctors thereafter, until plaintiff was cleared to return to work on November 25, 2002.

Also belying DRBA's current contention is the fact that it paid sick leave benefits.* DRBA readily accepted the doctors' determinations and paid plaintiff for the 76 days of sick leave which he had accumulated as of July 31, 2002. DRBA's Personnel Manual (Ex. P-52) says that sick leave may be granted "when an employee is required to be absent from work: 1. Due to illness/injury of the employee." Paying plaintiff sick leave was a tacit admission that his disability began on August 9, 2002 and continued thereafter until his accumulated sick leave was used up. Whether or not he was struck by the Swett vehicle made no difference: he was disabled as of the time he went to Beebe Memorial Hospital where he was found not fit for duty.

---

* Although the jury did not see it, a letter from John Schaffer, Esquire, of Lamorte Burns dated November 4, 2003 (Ex. P-59) also belies DRBA's current contention. Mr. Schaffer wrote as follows: "Your client's Personal Injury Protection (PIP) coverage is primary to all other insurance and Mr. Kopacz should therefore/is required to file his claim against his own policy." Plaintiff could not recover under his PIP coverage unless he had been hit and injured by an automobile. Mr. Schaffer said nothing about Blue Cross/Blue Shield insurance because DRBA did not dream up that defense until several months later, i.e. about two years after the medical bills had been incurred.

Finally, the jury's verdict is supported by the testimony of defendant's medical expert, Dr. Jeffrey Malumed. Dr. Malumed first testified that plaintiff may have suffered a strain or sprain which should have resolved in a few weeks . He therefore accepted the injury. On cross-examination Dr. Malumed testified that if there had been no accident, plaintiff's history of back

5

problems could well have accounted for the aches and pains that he had. Dr. Malumed never
challenged the disability determinations at all. Dr. Malumed's testimony, standing alone, is
enough to support the jury's determination that the failure to pay maintenance and cure was
unreasonable because there was no evidence whatsoever to dispute the fact that plaintiff's
disability began while he was in the service of a ferry.

**B. There is ample evidence to support the award of compensatory damages.**

Plaintiff sought and recovered compensatory damages for the failure to pay maintenance
and cure. The evidence which plaintiff introduced showed beyond doubt that the consequences
were the direct result of DRBA's failure to pay maintenance and cure.

**1. Evidence of Blue Cross/Blue Shield coverage is irrelevant to
DRBA's duty to pay medical expenses and DRBA's contention is
contrary to settled law.**

Plaintiff's Blue Cross/Blue Shield policy did not cover medical expenses resulting from
an automobile accident that occurred while plaintiff was working. That was the thrust of Mr.
Littman's testimony, and he acknowledged that he had told plaintiff's counsel that very thing the
week before the trial started. He also said he was not surprised that plaintiff's counsel was told
the same thing when he inquired a year or so earlier after plaintiff submitted his medical bills at
the suggestion of DRBA's counsel.

Mr. Littman also testified that Blue Cross/Blue Shield will pay if the employer disputes
the claim, but it will then be subrogated to the employee's claim, which it would try to collect in
the future. Neither Mr. Littman nor the woman at Blue Cross/Blue Shield from a year earlier
told plaintiff's counsel that, so how is a policy holder to know that if Blue Cross/Blue Shield

personnel do not say so.  Furthermore, payment depends on the employer's contesting the claim, which is contrary to the employer's duty to pay promptly.

By making this argument, DRBA is trying to get this Court to make a ruling which is directly contrary to the thrust of all of the Supreme Court's cases on maintenance and cure. These say, for example, that the benefits should be paid promptly and that the right is not to be defeated by "restrictive distinctions" nor "narrowly confined."  See e.g. Aguilar v. Standard Oil Co., 318 U.S. 724 (1943).

In Vaughan v. Atkinson, 369 U.S. 527 (1962) a shipowner attempted to get a credit for the earnings of a seaman who was not paid maintenance when he should have been and therefore had to get a job.  The Court denied such a credit, and Mr. Justice Douglas' opinion shows why such efforts are not sanctioned.

> "It would be a sorry day for seamen if shipowners, knowing of the claim for maintenance and cure, could disregard it, force the disabled seaman to work, and then evade part or all of their legal obligation by having it reduced by the amount of the sick man's earnings.  This would be a dreadful weapon in the hands of unconscionable employers and a plain inducement, as Chief Judge Sobeloff said below (291 F.2d, at 820), to use the withholding of maintenance and cure as a means of forcing sick seamen to go to work when they should be resting, and to make the seamen themselves pay in whole or in part the amounts owing as maintenance and cure.  This result is at war with the liberal attitude that heretofore has obtained and with admiralty's tender regard for seamen."

DRBA's attempt to shift its legal liability off onto Blue Cross/Blue Shield is also a dreadful weapon being used by an unconscionable employer.  If accepted by this Court, it would undoubtedly be reversed on appeal.

**2.  Plaintiff's claim concerning the harm to his credit rating was made before suit was started and DRBA never pursued this during discovery, so its contention that "plaintiff never revealed these**

7

**damages" is false.**

After counsel was retained, he wrote to Bonnie Miller at DRBA on August 19, 2003 in an effort to avoid litigation. This letter, which was Exhibit P-56, was admitted in evidence but not permitted to be shown to the jury, and it read in relevant part as follows:

> "Enclosed are copies of the following medical bills
> which are unpaid: (list omitted)
> We request that you pay these immediately because
> Mr. Kopacz' credit rating has been impaired. If you
> fail to do so, we will file suit with the maintenance
> claim."

Ms. Miller forwarded our letter to John P. Schaffer, Esquire, of Lamorte, Burns & Co., Inc., and Mr. Schaffer wrote to counsel by letter dated August 27, 2003 (Ex. P-57). Counsel answered Mr. Schaffer by letter dated September 22, 2003 (Ex. P-58) and stressed that Mr. Kopacz' disability "had its onset while he was subject to the call of duty of one of DRBA's ferries. We are not aware of any questions about Mr. Kopacz' disability status and need for medical treatment."

Our letter of September 22, 2003 responded to all of Mr. Schaffer's concerns and added:

"This accident occurred over one year ago, and Mr. Kopacz has received nothing from DRBA. His credit rating has suffered."

Mr. Schaffer did not respond as requested but finally answered on November 4, 2003 (Ex. P-59). His letter read in relevant part as follows:

> "Your client's Personal Injury Protection (PIP)
> coverage is primary to all other insurance and Mr.
> Kopacz should therefore/is required to file his claim
> against his own policy."

The foregoing shows the duplicity of DRBA: Mr. Kopacz could recover from his PIP

carrier only if he was struck and injured by an automobile, so DRBA must have believed that he was, in fact, struck and injured by the Swett vehicle.  If they did not so believe, Mr. Schaffer's effort to shift their legal responsibility to another company which could not have been liable was fraudulent.

Since counsel's efforts to avoid litigation were unavailing, he started suit for maintenance and cure only as well as damages associated with its non-payment.

This is the normal routine in these cases.  A maintenance suit is non-jury, and the proof required by plaintiff is easily presented.  Counsel fees are very small, so filing a maintenance only suit presents an ideal opportunity for a responsible employer to immediately assess the situation and dispose of it as cheaply as possible.  This enables the seaman to get paid promptly, as he should.

As part of routine pre-trial procedure in New Jersey counsel filed a Proposed Discovery Plan with Magistrate Judge Donio, and a Scheduling Conference was held on January 6, 2004.  A copy of the Proposed Discovery Plan is attached as Exhibit 1.

In the Proposed Discovery Plan plaintiff referred to his claim for "various other things related to Defendant's arbitrary refusal to pay Plaintiff's maintenance and cure concurrently with the need."  Plaintiff requested 4 months for discovery but defendant sought 6.  Plaintiff sought an early trial date and added, "Plaintiff requests an expedited hearing because maintenance is involved."  Defendant sought a later trial date, and no expedited hearing was ever granted.

Since only maintenance was in issue, the central issue was whether plaintiff became disabled while in the service of the vessel, and the record from Beebe Medical Center should have satisfied that.  The remaining issue was the length of the disability, and the remaining

medical records should have satisfied that.  There was no claim for lost wages.  A non-jury trial should have taken about 3 hours, and it required only testimony from the plaintiff and the medical records.  That is the customary maintenance lawsuit.

With respect to discovery problems, plaintiff said, "There should be none since these cases are very easy to prepare."  Defendant, on the other hand, said, "Defendant intends to serve written discovery and to depose the plaintiff, driver of the SUV and all eyewitnesses."

Defendant then served interrogatories on plaintiff, and a copy of these is attached to DRBA's Motion as Exhibit 7, with plaintiff's answers attached as Exhibit 8.

The interrogatories were primarily aimed at determining what injuries were being alleged and what money losses were being claimed.  None of the interrogatories addressed the maintenance issue, and none dealt with any consequences resulting from the failure to pay maintenance.  The answers were prepared in good faith, and no interrogatory called for an answer which referred to plaintiffs' credit rating having been impaired due to the non-payment of the medical bills by DRBA.

Plaintiff's deposition was conducted on March 24, 2004.  It began at 11:45 a.m. and ended at 5:25 p.m.  During the deposition 43 exhibits were identified.

The only questions pertaining to maintenance dealt with plaintiff's expenses for board and lodging and his telephone discussion with Bonnie Miller in June 2003.  The remainder of the 5 3/4 hour deposition dealt with background information, his claims history, his history of back problems, the accident facts and his injuries and treatment therefor.  Plaintiff mentioned from time to time that his medical bills were unpaid, but he was never asked anything else referable to

his maintenance claim and the consequences from the non-payment. The transcript shows that DRBA's counsel was unfettered in her questioning, and plaintiff responded fully and freely.

The foregoing belies DRBA's assertion that plaintiff never mentioned his credit status during discovery. He stressed it twice before suit began, and defense counsel no doubt had copies of those letters. Plaintiff adverted to the consequences of non-payment in the Proposed Discovery Plan, and then it was up to defense counsel to explore it if she desired by written and oral discovery. She did neither. Plaintiff responded fully to everything asked of him and endured 5 3/4 hours of intensive questioning when counsel had every opportunity to ask about his credit rating and chose not to do so.

During the trial DRBA's counsel represented to the Court that plaintiff had never mentioned this during discovery. Plaintiff's counsel had no opportunity to answer this completely due to the time pressure of the trial. The foregoing, however, shows that the representation to the Court during trial was completely untrue. Furthermore, page 12 of the Final Pre-Trial Order pertaining to the disputed facts plaintiff intended to prove at trial concerning maintenance and cure reads in relevant part as follows:

> 48. Kopacz' credit rating was severely damaged by DRBA's
> failure to pay his medical bills.

DRBA said nothing about this in the Pre-Trial Order or during the final pre-trial conference, and it filed no Motions in Limine to preclude such evidence. The assertion at trial, therefore, was made in bad faith. The arguments in DRBA's brief are equally specious because DRBA was alerted to the credit rating claim before suit was started, and it had a full opportunity to inquire into this by written and oral discovery and failed to do so. If there was any surprise, it was caused by DRBA's obsession with trying, unsuccessfully, to develop a credibility attack,

11

and with issuing subpoenas to everyone under the sun and accumulating unnecessary and irrelevant records and not concentrating on the issues in the lawsuit and preparing to defend against them.  All of this discovery was taken when only maintenance was at issue.  Plaintiff couldn't prevent it because discovery is so broad, but very little dealt with the very simple issues in the non-jury lawsuit then pending.

DRBA's complaint about a lack of expert testimony concerning plaintiff's credit rating is makeweight.  Expert testimony is admissible if the Court believes that "scientific, technical or other specialized knowledge will assist the trier of fact..." F.R.E. 702.  Every juror has a credit rating, and no specialized training is necessary to understand whether one's credit standing has been impaired.

DRBA now complains about the testimony concerning the telephone call collection efforts.  If plaintiff had been asked during his 5 3/4 hour deposition on March 24, 2004, he would have testified about them at length because he was then getting them.

All of DRBA's complaints on these issues arise from its own misdirected efforts, and this should not penalize plaintiff, although the court's trial rulings can't be undone.

### 3.  Kopacz alleged and proved legally compensable injuries as a result of DRBA's failure to pay.

Kopacz' proof concerning the suffering he endured as a result of DRBA's failure to pay maintenance and cure essentially boiled down to three areas:  1) his denial of medical treatment due to non-payment of medical expenses; 2) his anguish from receipt of dunning telephone calls due to the unpaid medical bills; and 3) the negative impact of the non-payment on his credit rating and the increased interest he had to pay because of that.

Demand for the payment of medical expenses was formally made by letter dated August 27, 2003 to Bonnie Miller at DRBA (Ex. P-56).  Suit was started on October 29, 2003, and written discovery was provided to DRBA.  Plaintiff's deposition was taken on March 24, 2004.  DRBA had subpoenaed all of the medical records, and it had a full record as of plaintiff's deposition.  As of March 1, 2004, when plaintiff served his Answers to Interrogatories, the unpaid medical bills had been provided to DRBA but remained unpaid.  Plaintiff also answered, and testified during deposition, that he was still suffering bouts of pain which disabled him on occasion.

The testimony at trial showed that plaintiff was being treated for pain management by Dr. Mohammad Mehdi, who had injected him with steroids on a few occasions.  The injections relieved the pain for awhile, but it returned.

The records from Orthopaedic Associates of Southern Delaware (P-31 and D-43) showed that Kopacz was scheduled for another injection, but it was cancelled:

> 05/2004 - Patient was scheduled for a right L4-5, L5-S1 Transforaminal Nerve Root Injection to be done at CPCC on 6/10/2004.  This had to be cancelled because we are not able to get an insurance approval.

Further,

> We were unable to schedule spinal injections for Mr. Kopacz at Coastal Same Day Surgery Center due to the fact that he had no insurance and that two other claims have been denying payment.

Dr. Mehdi testified that Kopacz came to see him for treatment on June 10, 2004 and he, Kopacz, and Mrs. Kopacz were in an examination room when the office manager, Janice Ambrose, came in and told Kopacz that she wanted a payment plan (the note says $5 per month but Kopacz testified he did not recall that a specific amount was mentioned) in order to continue

13

treatment.

Kopacz testified that he was under great stress due to all of the unpaid medical bills (in excess of $10,000 plus $4,000 for a legal bill arising from the Insurance Fraud allegation) and became upset because he was in pain and was there for treatment and was not expecting Ms. Ambrose.

Dr. Mehdi testified to a heated exchange of words, as a result of which Ms. Ambrose left the room and reportedly called the police. After the dispute, Mr. and Mrs. Kopacz thanked Dr. Mehdi for being so helpful and left. Thereafter the owner of the practice wrote to Kopacz and said he could no longer be treated.

Dr. Mehdi left that practice and started on his own. He testified that Kopacz called and asked to become his patient but that he declined because he could not take him as a patient in light of Dr. Spieker's letter discharging him.

The foregoing belies the statement by DRBA that "Kopacz was never denied medical treatment for any physical problems following this particular incident." (Brief, p. 8)

The other element concerns the stress due to the dunning telephone calls and the negative impact on Kopacz' credit rating.

DRBA's argument to defeat this element of damages is that emotional distress damages are not allowed in Jones Act cases, so they should not be allowed in a general maritime law setting. This argument was specifically rejected in Deisler v. McCormack Aggregates Co., 54 F.3d 1074 (3rd Cir. 1995). There the Third Circuit traced the judge-made development of the right to maintenance, which long pre-dated the passage of the Jones Act in 1920, and cited Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367 (1932) as holding that the passage of the

14

Jones Act had no effect on what was recoverable for the failure to provide maintenance and cure. In particular, the <u>Deisler</u> court said, "Thus consequential damages for failure to pay maintenance and cure are not limited to claims under the Jones Act. This is consistent with the Supreme Court's decisions in <u>Cortes</u> and <u>Vaughan</u>, *supra.*" 54 F.3d at 1084.

<u>Deisler</u>, therefore, completely rejects the contention of DRBA, and <u>Deisler</u> is binding on this Court because it is a Third Circuit opinion. DRBA's reliance on <u>Bavarro v. Grand Victoria Casino</u>, 2001 WL 289782 (N.D. Ill. 2001) is misplaced. Similarly, <u>Smith v. Delaware Bay Launch Service, Inc.</u>, 842 F.Supp. 770 (D. Del. 1994) is also of no help to DRBA. <u>Smith</u> simply involved a seaman who was believed by the jury but not by the trial judge.

The lodestone case allowing damages for the failure to pay maintenance and cure is <u>Cortes v. Baltimore Insular Line, Inc.</u>, 287 U.S. 367 (1932). The Court used general language when creating the right. <u>Vaughan v. Atkinson</u>, 369 U.S. 527 (1962), citing <u>Cortes</u>, held that "While failure to give maintenance and cure may give rise to a claim for damages for the suffering, and for the physical handicap which follows (citation omitted), the recovery may also include 'necessary expenses.'" 369 U.S. at 530. Accordingly, the recovery is not limited to the consequences of a prolongation of the injury, but includes other items as well, especially expenses. Lost wages due to incapacity resulting from inability to get medical treatment were first upheld in <u>Neville v. American Barge Line Co.</u>, 276 F.2d 117 (3rd Cir. 1960).

<u>Deisler v. McCormack Aggregates Co.</u>, 54 F.3d 1074 (3rd Cir. 1995) is the most recent examination of the issue in this Circuit, and it says that failure to pay maintenance and cure entitles the seaman to "consequential" damages, which is a broader concept than "compensatory" damages. <u>Deisler</u> upheld an award for wages lost due to inability to have

corrective back surgery because the shipowner would not pay for it.  The idea is to make seamen "whole" (54 F.3d at 1085), and this also underlies the award of pre-judgment interest (54 F.3d at 1087).  Again, however, the award is for both economic and non-economic damages such as pain and suffering, so long as they are consequential to the failure to pay.

In this case the record is clear that plaintiff was denied palliative treatment to alleviate his pain due to the non-payment of the medical bills.  There was also testimony that plaintiff's interest rate upon borrowing additional money to bury his wife and to pay off the medical bills was higher because his credit rating had been impaired.  Plaintiff did not have the exact figures because the loan had been made just a few weeks before the beginning of the trial.

There was also testimony concerning the pain and suffering of plaintiff stemming from not only the lack of medical care but also the dunning telephone calls and having been saddled with more than $10,000 in unpaid debt while living on an annual income of $40,000.  This is as real as the pain and suffering from physical injury, and it manifested itself when plaintiff was confronted by the office manager to agree to a payment plan for one of the unpaid medical bills.

DRBA did not object to the introduction of this evidence in the Pre-Trial Order or at the Pre-Trial Conference, and it never filed a Motion in Limine.  Its objection at trial was on the basis of surprise, which was false, but DRBA did not otherwise claim that it was inadmissible.  Plaintiff believes that this contention, made after the trial, is too late.

**C.  DRBA is not entitled to a new trial.**

DRBA apparently seeks a new trial only on one issue, yet it fails to say anything about the undisputed fact of its intransigence since the maintenance and cure were not paid until February 27, 2006 , about 3 ½ years after the obligation accrued.

16

The trial errors it alleges have no merit.  In fact, the truly prejudicial rulings were all made against the plaintiff.

### 1.  Evidence of the FAA physical was properly admitted.

DRBA complains that plaintiff did not disclose "this information" during pretrial discovery.

Plaintiff is under no obligation to develop defendant's evidence.  Plaintiff was deposed on March 24, 2004, and the deposition lasted 5 3/4 hours.  Defense counsel was unfettered in her questioning.

In response to questioning plaintiff admitted that he had had a pilot's license since November 1967 and that it was current (which it was and still is).  He was not asked if he was obligated to take periodic physical examinations, and this is something readily known by any licensed pilot.

The entire questioning on the issue was as follows:

Q.  Do you have a pilot's license?

A.  Yes.

Q.  And that's current?

A.  Yes.

Q.  Do you own an aircraft?

A.  No.

Q.  How long have you had a pilot's license?

A.  Since November 1967.

Q.  What size aircraft does your current license allow you to pilot?

17

> A.  I can fly multi-engine, single-engine planes.  I've flown aircraft as large as a 707, as small as a Cessna 150.  I also fly balloons.
>
> Q.  Bearing in mind I know nothing about aviation, what type of license is it?  In other words, is it commercial?  Is it just for transporting yourself?  Is it for passengers?
>
> A.  It's commercial for passengers or cargo for hire.  I also have flight instructor ratings for single-engine aircraft, multi-engine aircraft, for instrument aircraft in instrument conditions and for balloons.

Plaintiff is under no obligation to volunteer information.  Since plaintiff's physical condition was a primary issue in this case, it is more than surprising that defense counsel asked nothing about plaintiff's physical condition as affecting his ability to fly.

Instead of arguing that plaintiff did not disclose "this information", defense counsel should acknowledge that she didn't ask for it.  If she had, she would have gotten a full explanation as she did on everything else she asked.

### 2.  Evidence of plaintiff's efforts to have DRBA pay the maintenance and cure without the need for suit was properly admitted.

The letters from plaintiff's counsel were not a "settlement demand," and the effort to have them excluded on the argument that settlement discussions may not be admitted is preposterous.

Efforts to get DRBA to pay the maintenance and cure are directly relevant to the reasonableness of DRBA's refusal to pay.   Such efforts are discussed in virtually every case involving the failure to pay maintenance and cure.

18

The error was in not permitting the letters to go to the jury.  These letters showed that plaintiff's counsel was stressing when the disability began because the cause of the disability is totally irrelevant, and that is basic hornbook law on maintenance.  Plaintiff's counsel repeatedly stressed that plaintiff was indisputably entitled to maintenance because his disability had its onset while he was subject to the call of the vessel.  DRBA never met this contention; it just stonewalled.  At one point DRBA's adjuster said that plaintiff should look to his PIP carrier, and this was a tacit admission that plaintiff was struck by the Swett vehicle.

The letters were directly relevant to the issue of whether suit was necessary, and there is no possible argument which would justify their exclusion.

The real prejudice occurred when the court prevented plaintiff from asking Ms. Miller about what opinions she received from the 2 maritime lawyers she had at her disposal.  These were John Schaffer of Lamorte, Burns and Karen Hildebrandt of the insurance company, neither of whom had an attorney-client relationship.

The court sustained an objection on the basis that it had already ruled such testimony out in its discovery ruling.  This was not true.  The discovery issue dealt with the production of writings which the court decided were prepared in anticipation of litigation and had nothing to do with opinions.

Due to the pressure of time the Court did not read its Opinion but accepted counsel's representation and sustained the objection.

The opinions sought here bore directly on the reasonableness of DRBA's refusal to pay the maintenance and cure.  Such an opinion was discussed at some length by the Third Circuit in Deisler, *supra.* at 1086.  In fact, Lamorte, Burns, DRBA's adjuster, was the same company

19

involved in the <u>Deisler</u> case although a different adjuster handled that matter.

      **3.  Evidence of liability insurance was not deliberately injected by plaintiff, and there is no evidence that it prejudicially affected the jury's verdict.**

Counsel's questions to Ms. Miller were carefully phrased so as not to inject the issue of liability insurance into the case, but her answers did mention it.

In the context in which it came in, it was not prejudicial and DRBA's counsel never asked for an instruction to the jury that they were to disregard it.  DRBA's counsel never asked for a jury charge on this issue, and there is no evidence that the jury was prejudiced.

The argument has no merit whatsoever.

      **4.  Evidence of the harm to plaintiff's credit rating was properly admitted.**

DRBA again claims surprise when the problem lies in the shortcomings of its preparation.

As discussed earlier, the harm to plaintiff's credit rating was mentioned in the letters to DRBA and its claims adjuster before suit was ever started.   The fact that DRBA's interrogatories did not refer to this can't be blamed on plaintiff.  Similarly, plaintiff was interrogated at deposition for 5 3/4 hours and was never asked about this, so DRBA had every opportunity to explore this to its heart's content but failed to do so.  All of this discovery was taken in the suit where only maintenance and cure were in issue.

In the Pre-Trial Order under Contested Facts - Maintenance and Cure - No. 48 of Plaintiff's Contested Facts reads, "Kopacz' credit rating was severely damaged by DRBA's failure to pay his medical bills."

DRBA said nothing about this in the Pre-Trial Order, and it said nothing during the Pre-

20

Trial Conference.  It did not file a Motion in Limine to preclude the evidence, and it said nothing about this in connection with the court's charge.

Against that background plaintiff can only conclude that the claim of surprise made during the trial was not made in good faith.  DRBA's arguments in the Post-Trial Motion are equally specious.

### 5.  The evidence of bias on the part of Willey was properly introduced, and the Court prejudiced plaintiff by instructing the jury to disregard it.

Drinking intoxicating beverages was not in any way relevant to a determination of liability, so the potential prejudice stemming from such evidence was not present.

The evidence of Willey's past drinking habits and its effect on his driving and tardiness were directly relevant to the reason for the bad feeling between plaintiff and Willey.  It was therefore properly admitted, and the Court prejudiced plaintiff by instructing the jury to disregard it.

### 6.  Plaintiff cannot address the issue of the voir dire questioning of the jury because DRBA is not specific.

DRBA has not set forth enough facts to enable a fair discussion of the issue it raises.

Kiernan v. Van Schaik, 347 F.2d 775 (3rd Cir. 1965) is not apposite.  Kiernan dealt with a voir dire conducted exclusively by the Court with no allowance to counsel to interrogate the jurors.  That was not the situation here.

In this case the Court allowed both counsel extensive questioning of each prospective juror who responded affirmatively to one or more general questions asked by the Court to

determine the existence of possible bias.

In <u>Kiernan</u> the Third Circuit upheld the District Court's rejection of two questions sought to be asked. In light of the extensive questioning by the Court and the individual questioning by counsel in this case, all of the potential prejudices were probably uncovered. Furthermore, the questions which DRBA now contends might have shown prejudice do not in any way relate to the jury's unanimous answers to the interrogatories.

### 7. Failure to instruct the jury as requested by DRBA concerning cure was not error.

Earlier plaintiff discussed how disingenuous it is for DRBA to attempt to shift its legally imposed duty onto an insurance company which did not provide coverage in the first place.

<u>Shaw v. Ohio River Co.</u>, 526 F.2d 193 (3rd Cir. 1975) is misstated. <u>Shaw</u> involved an attempt by a seaman to recover from the shipowner medical expenses that had been paid by a medical provider. Here the medical provider did <u>not</u> pay any of the medical expenses, and its representatives told plaintiff's counsel on two occasions that there was no coverage.

The rule being suggested by DRBA would permit unconscionable shipowners to thwart and frustrate their seamen-employees from obtaining the prompt and adequate care which the law says the shipowner must provide. To obtain coverage, the shipowner would first have to deny the claim, and this is contrary to the thrust of the Supreme Court cases which all say essentially as follows:

> "[E]asy and ready administration of the shipowner's duty would seriously suffer from the introduction of complexities and uncertainty that could 'stir contentions, cause delays, and invite litigations.'"

22

<u>Vella v. Ford Motor Co.</u>, 421 U.S. 1 (1975)

All of the Supreme Court jurisprudence is directed to requiring the shipowner to satisfy its duty to provide prompt and adequate medical care, and DRBA asks this Court to commit reversible error by holding otherwise.

### 8.  Plaintiff was not allowed to argue that DRBA invaded his privacy, so there was no error.

Plaintiff did obtain testimony from Ms. Miller and Ms. Spence-Parker concerning Miller's disclosure of DRBA's investigation to Swett's insurance carrier.  However, the Court would not permit counsel to explore this further, so the jury never learned the reason for those questions.  Accordingly, plaintiff suffered the real prejudice and DRBA suffered none at all.

### 9.  No other rulings adversely affected DRBA.

The record will show no other rulings which prejudiced DRBA.  In fact, the Court's rulings largely prejudiced plaintiff, so DRBA should not be heard to complain.

## III.  Conclusion

For the foregoing reasons, DRBA's Motion should be denied.

**SEITZ, VAN OGTROP & GREEN, P.A.**

/s/ James S. Green
**JAMES . GREEN, ESQ. (DE0481)**
**jgreen@svglaw.com**
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600
        Attorneys for Plaintiffs

OF COUNSEL:

23

E. Alfred Smith, Esquire
E. Alfred Smith & Associates
1333 Race Street, Second Floor
Philadelphia, PA 19107

Date: March 16, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, JAMES S. GREEN, hereby certify that on this 16th day of March, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to counsel of record.

**Plaintiff's Brief in Opposition to
DRBA's Motion for Judgment N.O.V.
or for a New Trial**

/s/  James S. Green

_____

JAMES S. GREEN (ID No. 0481)
jgreen@svglaw.com

25